PENNSYLVANIA R. Co. *et al. v.* ALLEGHENY VAL. R. Co. *et al.*

(*Circuit Court, W. D. Pennsylvania.* August 31, 1891.)

1. RAILROAD MORTGAGES—FORECLOSURE—SALE FOR DEBT DUE—PRESERVATION OF LIEN OF UNMATURED PART.

In a proper case, a court of equity has the power so to mould its decree as to order a sale of mortgaged premises to satisfy that part of the mortgage debt which is due, and preserve the lien upon the mortgaged premises in the hands of the purchaser as to the unmatured part of the debt.

2. SAME—BONDS—COLLECTION OF COUPONS—REMEDIES.

Company A. negotiated its coupon bonds, secured by a mortgage upon its railroad, etc., each bond having an indorsement by Company P., binding it to purchase at maturity the bond and each interest coupon, at par, "and, when so purchased, each and all of said bonds and coupons are to be held by the said company, with all the rights thereby given, and with all the benefit of every security therefor." Company P., having been obliged to purchase coupons, filed a bill before the maturity of the bonds. *Held*, that the contract of purchase is to be so construed as to perserve to the bondholders their mortgage lien until Company P. shall have fully performed its obligations according to the tenor of its indorsement, and that in the mean time its remedies upon purchased coupons must be kept within such limits as will effect that object.

3. SAME.

The equities of all the parties in interest being best subserved by a sale of the railroad, etc., under and subject to the lien of the said mortgage as to the principal of the bonds thereby secured, and the interest payable after the making of the sale, it was so decreed.

In Equity.

*Wayne MacVeagh* and *James A. Logan*, for complainants.

*John G. Johnson*, *George Shiras, Jr.*, and *D. T. Watson*, for income bond holders, complainants in cross-bill.

*Samuel Dickson*, for trustee under mortgage of March 31, 1869.

ACHESON, J.    At the end of this protracted litigation, the court is called on to decide, not whether a sale of the lines of railroad, franchises, and property generally of the Allegheny Valley Railroad Company should be decreed, but upon what terms with respect to the discharge of liens the sale shall be made.    The fixed charges are as follows:

"*First.* An issue of $4,000,000 of interest-bearing bonds, due March 1, 1896, secured by a mortgage dated March 1, 1866, on the company's main line, extending from the city of Pittsburgh to Oil City, being the first lien thereon.

"*Second.* An issue of $10,000,000 of bonds, with interest coupons payable semi-annually attached, due April 1, 1910, secured by a mortgage dated March 31, 1869, on the company's branch line, (the low-grade division,) extending from the main line to the mouth of Bennett's branch, being the first lien thereon; which issue of bonds is further secured by a mortgage dated September 4, 1874, on the company's main line, being the second lien thereon.

"*Third.* An issue of interest-bearing bonds to the commonwealth of Pennsylvania, of which, according to the allegations of the bill, about $2,600,000 remained unpaid, secured by a mortgage dated April 1, 1869, on said branch line, being the second lien thereon, and further secured by a mortgage dated September 5, 1874, on the company's main line, being the third lien thereon.

"*Fourth.* An issue of $10,000,000 of income bonds, due October 1, 1894, secured by a mortgage dated October 1, 1874, which is the fourth lien on the company's main line and the third lien on the said branch line.    This income bond mortgage of October 1, 1874, is expressly made under and subject to the lien of the five mortgages prior in date above mentioned, and the interest on the income bonds is made payable only out of the company's net income, after payment of interest on the bonds secured by prior mortgages."

The $10,000,000 of bonds secured by the mortgage of March 31, 1869, when negotiated, each contained an indorsement, lawfully made and duly executed by the Pennsylvania Railroad Company, one of the plaintiffs, as follows:

"For a valuable consideration paid, the Pennsylvania Railroad Company hereby covenant and agree, to and with the lawful holder of the within bond, that the Pennsylvania Railroad Company shall and will, upon the 1st of April, 1910, or thereafter when requested, upon delivery to them of the within bond, purchase the same for cash at par, and shall and will, upon the 1st day of October, 1871, and semi-annually thereafter, upon surrender and delivery to them of the proper interest warrants therefor, purchase from the lawful holder thereof, at par, each and every subsequent semi-annual sum of interest to become due upon the within bond, according to the tenor and effect of said bond, and the interest warrants thereto attached; and, when so purchased, each and all of said bonds and coupons are to be held by said company, with all the rights thereby given, and with all the benefit of every security therefor.    In witness whereof," etc.

And by a special indorsement on each coupon the Pennsylvania Railroad Company bound itself to purchase the same at par at maturity from the holder.

Before the filing of the bill in this case, as therein averred, the Pennsylvania Railroad Company, under its above recited contract, and by reason of the insolvency and default of the Allegheny Valley Railroad Company, had been obliged to purchase coupons of the bond issue of 1869, to the amount of $4,175,000; and it would seem that the total of its purchases of these coupons up to March 20, 1891, amounts to $6,336,245, exclusive of interest thereon. The plaintiffs, as guarantors, having lifted $400,000 of overdue bonds of the Allegheny Valley Railroad Company to the commonwealth, secured by the mortgages of April 1, 1869, and September 5, 1874, the now outstanding bonds yet held by the commonwealth, and not due, amount to $1,800,000. These bonds are payable in yearly installments of $100,000; the next installment on January 1, 1892, and the last on January 1, 1910. The commonwealth is not a party to this suit, and never voluntarily appeared in any of the proceedings herein. The proofs show that the plaintiffs, among themselves, hold and own $6,087,000 of the income bonds aforesaid of the Allegheny Valley Railroad Company. The bill prays for a sale of the corporate property, franchises, etc., of the Allegheny Valley Railroad Company, under and subject to the lien of the above-mentioned five mortgages, prior in date to the income bond mortgage of October 1, 1874, "as to the principal of the bonds thereby secured, and not theretofore matured, and the interest thereafter payable after the making of said sale;" the sale to pass to the purchasers the same title, excepting as to the liens so to be preserved, as would vest by a judicial sale upon a judgment recovered on the coupons lifted and held by the Pennsylvania Railroad Company, or upon a decree in a suit proceeding upon the mortgage upon which there was default, and that out of the proceeds of sale the Pennsylvania Railroad Company be paid the defaulted coupons, and the commonwealth be paid the defaulted installments due to her, and the balance to be distributed among the creditors entitled.

The trustees under the mortgages of March 31, 1869, and September 4, 1874, securing the $10,000,000 bond issue of 1869, submitted themselves to the court, but in their answer prayed "that, in the event of a sale being decreed, as prayed for in the said bill, such decree may be formulated and enforced as will leave unaffected the lien of the several mortgages of which they are trustees, except so far as the interest thereon may be payable out of the proceeds of said sale." The Allegheny Valley Railroad Company, in its answer, admitting the truth of the allegations of the bill, submitted itself to the judgment of the court, and has interposed no objection to a decree of sale in conformity with the prayer of the bill. The only opposition to the sale upon the terms contemplated by and prayed for in the bill comes from certain of the income bond holders (a minority in interest) who intervened in the suit, and are plaintiffs in the cross-bill, which contested the validity of the claim of the Pennsylvania Railroad Company, and went to defeat a sale altogether.

These parties, however, no longer deny, but concede, the right of the Pennsylvania Railroad Company, as the holder of overdue coupons of the bond issue of 1869, to a decree of sale; they now only insisting that the sale to be decreed shall be made upon terms discharging the lien of all the mortgages except the mortgage for $4,000,000, the first lien on the main line. Under the pleadings and proofs, then, what ought the terms of sale to be? I cannot doubt that, in a proper case, a court of equity has the power so to mould its decree as to order a sale of mortgaged premises to satisfy that part of the mortgage debt which is due, and preserve the lien upon the mortgaged premises in the hands of the purchaser as to the unmatured part of the debt. 2 Jones, Mortg. § 1459; *Fleming* v. *Soutter*, 6 Wall. 747. This power has been judicially recognized and exercised, (*Cox* v. *Wheeler*, 7 Paige, 248; *Weiner* v. *Heintz*, 17 Ill. 259; *Hughes* v. *Frisby*, 81 Ill. 188; *Burroughs* v. *Ellis*, 76 Iowa, 649, 38 N. W. Rep. 141;) and coupons, being the equivalent of bonds for separate installments of the mortgage debt, (*Clark* v. *Iowa City*, 20 Wall. 583,) clearly come within the principle of these decisions.

But the power of the court to decree a sale for the present realization of the matured part of a mortgage debt, while preserving the lien of the part not due, is not here so much controverted as is the propriety of the exercise of the power in this particular instance; and it may be, as the counsel for the objecting creditors contend, that such a decree ought not to be made except for special reasons, and where the equities upon which it is based are clear and prevailing. How, then, stands this case? In its circumstances the case is certainly peculiar. In the first place, the bill is carefully framed with a view of preserving the lien of the mortgages of March 31, 1869, and September 4, 1874, as respects the principal of the bonds thereby secured, and the interest to accrue after the sale, and the lien of the two mortgages to the commonwealth as to the installments which may not be due at the time of the sale, and the specific prayer of the bill is to that effect. The cross-bill contains no prayer for a sale, and the decree must rest upon the matters set forth in the original bill. Upon the pleadings, then, it is very difficult to see how the court can rightfully decree a sale upon terms essentially different from those specified in and sought by the original bill. 2 Jones, Mortg. § 1578. True, under the general prayer for relief, the court sometimes may grant relief not specifically asked for, but it must be such as is agreeable to the case made by the bill; otherwise, the court would take the defendant by surprise. 1 Daniell, Ch. Pr. 386. That very thing would happen here should the court so widely depart from the specific prayer of the bill as these income bond holders ask; for the trustees under the mortgages of March 31, 1869, and September 4, 1874, were not called on by the bill to resist a sale which should divest the lien of the mortgages, and the bondholders thereby secured have never had a proper opportunity of defending themselves against a decree attended with such a result. In the next place, the commonwealth of Pennsylvania has an interest in the property which might be seriously affected by such a sale as is now proposed, but is not a party to the suit. If it be con-

ceded, upon the authority of *Christian* v. *Railroad Co.*, 133 U. S. 233, 10 Sup. Ct. Rep. 260, that this would not hinder the sale, still, the qualification with which the supreme court there spoke is to be heeded: "In such a case, the foreclosure and sale of the property will not be prevented by the interest which the state has in it, but its right of redemption will remain the same as before." Pages 243, 244, 133 U. S., and page 263, 10 Sup. Ct. Rep. Thus, to say the least of it, an element of uncertainty would attend such a sale. Again, the mortgage of March 31, 1869, is the first lien upon the low-grade division, (the Bennett's branch line,) standing to it, in that regard, on the same footing as does the mortgage for $4,000,000 with respect to the main line; the lien of which latter mortgage all agree should be preserved. Furthermore, it is too plain for argument that, without the consent of the bondholders, the court cannot decree that the bonds of the issue of March 31, 1869, shall become presently payable; and, therefore, in the event of a sale discharging the mortgage lien, it would be incumbent upon the court to impound the principal for the protection of the bondholders, and either reinvest the fund, or otherwise secure it for their ultimate benefit. But, manifestly, that would be a very undesirable result, even were it clear that the Pennsylvania Railroad Company has the right to a decree involving such consequences.

But when we turn to the consideration of the equities of the respective parties, and reflect that the bonds of the issue of March 31, 1869, bear interest at the rate of 7 per cent. per annum, and are negotiable securities, having nearly 19 years to run, and hence possessing, undoubtedly, a market value much beyond their face value, we come to realize the great and certain injury to which the holders would be subjected by a decree destroying their mortgage lien. Surely a court of equity should long hesitate before inflicting this loss, and ought only to yield to some imperative rule of law, or for the sake of rights clearly superior. No such controlling legal principle is perceived.

Are there any predominant equities on the side of the income bond holders? To this question I am constrained to return a negative response. No evidence whatever has been submitted to the court to show that by a sale discharging the prior mortgages, as proposed, more could be realized for the income bond holders than by a sale preserving those liens. Nor is that result inherently probable in the nature of the case. Indeed, the reasonable presumption is, I think, quite the other way, as the purchaser at the sale upon the latter terms would be relieved from the necessity of immediately raising very large sums of money, and would have the benefit of long credits. At any rate, no one can confidently say that the terms of sale specified in the bill will prove detrimental to the income bond holders, or that any substantial advantage would accrue to them by substituting the proposed terms. In this connection, it must be remembered that the creditors objecting to the sale as prayed for in the bill constitute a minority of their class, and that the plaintiffs themselves hold more than three-fifths of the issue of income bonds. Moreover, a foreclosure and sale under the income bond mort-

gage itself (and it has but three years to run) would necessarily be subject to the lien of the prior mortgages not due. *Jerome* v. *McCarter*, 94 U. S. 736; 2 Jones, Mortg. § 1609. So that, in this regard, a decree in accordance with the prayer of the present bill will only anticipate by a brief period the unavoidable result awaiting the income bondholders.

To the argument based upon the provision of the mortgage of 1869, which gives, in distribution, to the overdue coupons priority over the principal of the bonds, the answer is twofold—*First,* that stipulation relates to a sale by the trustees under the special power conferred by the mortgage; and, *secondly*, the application of the proceeds of sale thereby provided for is simply the appropriation which the law itself makes where the fund is deficient, namely, to the discharge of accrued interest first, and then the balance to the principal of the debt. I fail to see how this particular clause of the mortgage operates as any obstacle or valid ground of objection to the decree the plaintiffs seek.

But, finally, the case is to be considered with reference to the contractual relations between the Pennsylvania Railroad Company and the holders of the bonds of the issue of March 31, 1869. In view of its indorsement upon those bonds, can the company rightly ask broader relief than what is here specifically prayed for? A sale in the manner, and subject to the conditions, mentioned in the bill, while entirely just to that class of bondholders, would yet afford the Pennsylvania Railroad Company the equitable relief to which it is now fairly entitled. Ought the company to demand more? It is a familiar doctrine that in enforcing the right of subrogation there can be no interference with the creditor's securities until he is fully satisfied. *Kyner* v. *Kyner*, 6 Watts, 221; *Bank* v. *Potius*, 10 Watts, 148. Now, it is true that the Pennsylvania Railroad Company is not here technically a surety, clothed simply with the implied right of subrogation, but its contract of purchase, indorsed on the bonds when put upon the market, and upon the faith of which they were negotiated, ought to receive such an equitable construction as will conserve the interest of the bondholders. Looking at the purpose the parties to the transaction then had in view, can it be for an instant supposed that they intended that, whenever the Pennsylvania Railroad Company was obliged to take up a batch of coupons, it might proceed by a strict foreclosure to sweep away from the bondholders their mortgage security? The terms of the indorsement do not require that a construction so unreasonable shall be given to it. The parties themselves, it would seem, have not so understood their contract. Why, then, should an inequitable interpretation of the contract, upon which the parties thereto do not insist, prevail? It rather seems to me that the contract is to be construed so as to preserve to the bondholders their mortgage lien until the Pennsylvania Railroad Company shall have fully performed its obligations according to the tenor of its indorsement, and that in the mean time its remedies upon purchased coupons must be kept within such a limit as will effect that object. Surely, however, the company is not bound to pursue a course needlessly prejudicial to those bondholders.

Upon the whole case, I am of opinion that the original bill was framed upon the true theory of the equitable rights of all the parties in interest, and that the sale of the property of the Allegheny Valley Railroad Company, which all now agree must be decreed, should be upon the terms specifically prayed for in the bill.